

1  GIRARDI | KEESE
2  THOMAS V. GIRARDI, SBN 36603
   tgirardi@girardikeese.com
3  STEPHEN G. LARSON, SBN 145225
   slarson@girardikeese.com
4  GRAHAM B. LIPPSMITH, SBN 221984
5  glippsmith@girardikeese.com
   1126 Wilshire Blvd.
6  Los Angeles, CA 90017
7  Telephone: (213) 977-0211
   Facsimile: (213) 481-1554
8
9  WILKES & McHUGH
   CASEY A. HATTON, SBN 246081
10 3780 Kilroy Airport Way, Suite 220
11 Long Beach, CA 90806
   Telephone: (562) 424-3003
12
13
14            UNITED STATES DISTRICT COURT
15           NORTHERN DISTRICT OF CALIFORNIA
16              SAN FRANCISCO DIVISION
17 BARTON SPINDLER, DEBORAH        )  CIVIL ACTION NO.
18 UNDERWOOD and VALERIE BURKS,    )
                                   )  CV 10 1414  EDL
19        Plaintiffs,              )
                                   )
20 vs.                             )  COMPLAINT
                                   )
21 JOHNSON & JOHNSON CORP.,        )  DEMAND FOR JURY TRIAL
22 OMNICARE, INC., and DOES 1-10., )
   Inclusive.                      )
23                                 )
                                   )
24        Defendants.              )
   _____)
25
26
27
28
                              1
   _____
                     COMPLAINT

## COMPLAINT

On information and belief, Plaintiffs Barton Spindler, Deborah Underwood and Valerie Burks allege as follows:

### Introduction

1.      This is a case involving the exploitation of the approximately more than a million residents of nursing homes in the United States. The residents are the frail and elderly portions of our society who are among our most vulnerable.  These residents are unique in our population when it comes to the use of pharmaceutical drugs. The residents are administered the greatest number of drugs, have the least ability to protest if the drugs are administered inappropriately and have the most consistent of payment sources, state and federal governments. This "perfect storm" of need, vulnerability and guaranteed payment are the environment in which the defendants created a scheme of kickbacks, illicit sales promotion, price fixing and avoidance of federal regulation. Defendant Johnson & Johnson Corp. ("Johnson & Johnson") is a pharmaceutical manufacturer. Omnicare, Inc. ("Omnicare") occupies a "dual" role of a dispensing pharmacy and consulting pharmacy for approximately 1,400,000 nursing home residents, representing approximately 90% of the Medicare certified nursing home beds in the United States.

2.      The Defendants conspired to create "programs" that violated Medicaid's best price law. This law was intended to ensure that Medicaid paid the lowest price available for drugs. The Defendants violated this law and then covered up the violations by a program of rebates, kickbacks, and illusory service agreements in order to increase market share, revenue and profitability for the defendants. The Defendants also created programs to increase the use of drugs in the elderly in such a brazen manner that they named one of the programs "one extra script per patient." Defendant Johnson & Johnson paid Defendant Omnicare to run the program designed to increase drug use for residents even though all defendants knew that one of Omnicare's duties as a consulting pharmacy was to advise and determine methods to reduce drug use for residents. Further Defendants agreed and in fact their agreement required that Omnicare use its position of power and influence over the residents as a consulting pharmacist to market and recommend certain of

Johnson & Johnson drugs by giving the Johnson & Johnson drugs elevated status as the default drug of choice without regard to best interests of the residents. The Defendants made this agreement even though all the Defendants knew that one of Omnicare's duties as a consulting pharmacy was to ensure the best medication for a resident. Defendant Omnicare had a conflict: it could push Johnson & Johnson drugs and receive kickbacks in the form of yearly discounts and marketing fees or do what was best for the residents. Defendant Omnicare in concert with Defendant Johnson & Johnson resolved the conflict illegally in favor of revenue.  As a result, residents were overcharged for their medications, had additional medications administered and were unlawfully switched to Johnson & Johnson drugs all as part and parcel of the Defendants' conspiracy to increase revenue.  Omnicare engaged in self-dealing and agreed to become a marketing arm for Johnson & Johnson in violation of Omnicare's duties as a dispensing and consulting pharmacy for the benefit of the elderly and infirm.

## Jurisdiction and Venue

3.      Jurisdiction in the Northern District of California is proper under 28 U.S.C. § 1332 based on the parties' diversity of citizenship.  The amount in controversy exceeds $75,000.00 and is in excess of the jurisdictional limit for the United States District Court.

4.      Venue is proper in this Court under 28 U.S.C. § 1391 because at least one of Defendants operates facilities and conducts a substantial amount of business in the Northern District of California and a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of California.

## The Parties

5.      Plaintiff Barton Spindler brings this claim individually and on behalf of all those similarly situated.  Barton Spindler is the successor in interest to Seymour Spindler, who is deceased.

6.      Seymour Spindler was a resident of Manor Care Nursing Center of Hemet in Hemet, Riverside County, California from November 9, 2005 to November 21, 2005. During Mr. Spindler's residency, Mr. Spindler was given Levaquin.

7.   At material times during Mr. Spindler's residency, Omnicare, Inc., by and through its agents or subsidiaries, provided goods and services directly and/or indirectly to him as both the dispensing pharmacy and the consulting pharmacy.

8.   Plaintiff Deborah Underwood brings these claims individually and on behalf of all those similarly situated.  She is the personal representative of the Estate of Geraldine Strawderman.

9.   Geraldine Strawderman was a resident of Evergreen Valley Health and Rehabilitation Center in Mesa, Arizona from February 25, 2005 through September 28, 2006.  During Ms. Strawderman's residency, Ms. Strawderman was given Levaquin.

10.   At material times during Ms. Strawderman's residency, Omnicare, Inc., by and through its agents or subsidiaries, provided goods and services directly and/or indirectly to her as both the dispensing pharmacy and the consulting pharmacy.

11.   Plaintiff Valerie Burks n/k/a Valerie Blueford brings these claims individually and on behalf of all those similarly situated.  She is the personal representative of the Estate of Dora Backus.

12.   Dora Backus was a resident of Quapaw Quarter Nursing Center and Rehabilitation in Little Rock, Arkansas from April 11, 2003 through April 24, 2005.  During Ms. Backus's residency, Ms. Backus was given Risperdal.

13.   At material times during Ms. Backus's residency, Omnicare, Inc., by and through its agents or subsidiaries, provided goods and services directly and/or indirectly to her as both the dispensing pharmacy and the consulting pharmacy.

14.   Omnicare provides goods and services to nursing home residents directly and indirectly through agents and subsidiaries, including, but not limited to the following: NeighborCare of Northern California, Inc; Alacritas Biopharma, Inc.; Clinimetrics Research Associates, Inc.; Evergreen Pharmaceutical of California, Inc. f/k/a/ PIP Acquisition, West Val Premiere; In-House Pharmacies, Inc.; NeighborCare of California, Inc.; NeighborCare – TCI2, LLC; NeighborCare-Medisco, Inc.; Premier Institutional Pharmacy, Inc.; PIP Acquisition, Corp.; Bay Pharmacy; Home Care Pharmacy; United Pharmacy Associates; Neighborcare Pharmacy Services, Inc.; Badger Acquisition of Tampa, LLC; Omnicare Senior Health Outcomes; and

-4-

American Pharmaceutical Services. Fifteen (15) of Omnicare's subsidiaries are located in California. There is no state in which Omnicare has more locations than it does in California.

15.     Omnicare is the nation's largest provider of pharmacy dispensing services and pharmacy consulting services to long-term care facilities in the country.  Over the last several years, Omnicare provided goods and services to millions of residents in 47 states, including California.

16.     In 1999, Omnicare provided goods and services to more than 715,000 residents.  By 2009, the number of residents to and for whom Omnicare provided goods and services annually exceeded 1.37 million.

17.     Johnson & Johnson is headquartered in New Brunswick, New Jersey and engages in business throughout the country.

18.     Johnson & Johnson is a manufacturer and seller of pharmaceutical products and medical devices by and through various direct and indirect subsidiaries including, but not limited to: Ortho-McNeil-Janssen Pharmaceuticals, Inc and Johnson & Johnson Health Care Systems, Inc.

### Factual Allegations

19.     As part of their combination and conspiracy, Johnson & Johnson and Omnicare used Omnicare's direct contact with nursing homes and their residents as an opportunity for Johnson & Johnson and Omnicare to increase revenues at the residents' and the health care system's expense.

20.     In 1987, Congress amended the Social Security Act to make clear that nursing home residents had the right to be free from chemical restraint imposed for convenience or as a form of discipline. *See* 42 U.S.C. § 1396r(c)(1)(A)(ii).

21.     Thereafter, the Department of Health and Human Services created implementing regulations requiring that nursing homes conduct monthly drug regimen reviews of each resident. *See* 42 C.F.R. § 483.60(c). This requirement helped grow Omnicare's consulting business in the long-term care industry by providing consultant pharmacists to meet the monthly drug review requirements.

22.     In 1989, Omnicare developed a program to acquire companies that provide pharmaceutical goods and services to Omnicare's target market, the long-term care sector.  At that

-5-

time, Omnicare provided goods and services to less than ten (10) percent of the long-term care market.

23.    In the late 1990's while Omnicare was a force in the long term care pharmaceutical goods and services market, it only served approximately thirty (30) percent of the market.

24.    Omnicare recognized strength in the long-term care pharmaceutical market as an opportunity to earn extra revenue and additional market share by partnering with drug manufacturers like Johnson & Johnson.

25.    In as early as 1997, Omnicare and Johnson & Johnson reduced their combination and conspiracy to writing.

26.    Effective April 1, 1997, Omnicare entered a "Supply Agreement" with Johnson & Johnson.  The Supply Agreement governed the supply and distribution of certain listed Johnson & Johnson pharmaceuticals deemed "Strategic Products" as well as the exchange of certain marketing information between Omnicare and Johnson & Johnson.

27.    Under the Supply Agreement effective April 1, 1997, Johnson & Johnson agreed to pay Omnicare "performance rebates" for the sale and distribution of the Strategic Products manufactured by Johnson & Johnson.

28.    The rebates were paid "in amounts based on the utilization of the [Strategic] Products by the patients covered under Benefits managed by [Omnicare]."

29.    The "patients covered" included approximately 90% of all nursing home residents in the United States.

30.    Pursuant to this Supply Agreement, Omnicare agreed to encourage the physicians and nursing homes to use Johnson & Johnson products for residents using "mechanisms like Active Intervention Programs."

31.    In the Supply Agreement, an "Active Intervention Program" was a program "applied" by Omnicare and accepted in writing by Johnson & Johnson which was designed to "shift market share" to Johnson & Johnson from other pharmaceutical manufacturers.

32.   The "Strategic Products" targeted in the Supply Agreement that generated payments from Johnson & Johnson to Omnicare were Floxin, Levaquin, Risperdal, Ultram, Duragesic and Procrit. Omnicare's distribution of Propulsid was also listed as a bonus-generator.

33.   Omnicare and Johnson & Johnson treated the rebates as a "year-end bonus" according to the Supply Agreement.

34.   Additionally, the Supply Agreement required that Omnicare and Johnson & Johnson meet quarterly to review their joint "business plan" and "performance goals."

35.   The Supply Agreement specifically required that Omnicare's consultant pharmacists attend a training session for the sale of Propulsid and a training session for the sale of Risperdal.

36.   Thereafter, as part of their Risperdal Initiative, Omnicare sent a "Patient Specific Therapeutic Interchange Protocol for Risperdal" to all of its pharmacists.

· 37.   The document is a marketing pamphlet for the use of Risperdal in geriatric dementia residents.

38.   Additional documents were provided to Omnicare's dispensing and consulting pharmacists that include scripted communications with the prescribing physicians under various scenarios to encourage the physicians to change the prescribed typical or atypical antipsychotic to Risperdal regardless of whether the residents' current medication(s) was or were effective.

39.   In 1999, Omnicare and Johnson & Johnson signed another "Supply Agreement" which added Aciphex as a "Strategic Product" warranting bonus payments from Johnson & Johnson to Omnicare.

40.   The Supply Agreement between the two companies effective April 1, 1999 contained a number of additional components including the tracking of annual purchases per nursing home bed.

41.   Another element of the 1999 Supply Agreement was the creation of a maximum discount for each of Johnson & Johnson's drugs to avoid Medicaid's "Best Price" threshold which would have required passing the discounts and rebates along to Medicaid.

42.   When the "Best Price" threshold was breached, the Supply Agreement required a retroactive price adjustment to bring the price of the Johnson & Johnson drug above the Medicaid published list price for the particular drug.

43.   To avoid the Medicaid "Best Price" threshold, Omnicare and Johnson & Johnson created other mechanisms for the transfer of money from Johnson & Johnson to Omnicare in furtherance of the scheme generated by these two companies.

44.   In June 1999, Johnson & Johnson recognized challenges to making required rebate payments to Omnicare without violating Medicaid's requirements. Johnson & Johnson developed two solutions. "OPTION I – Legal Payment of the Rebate" and "OPTION II - $300K Fee for Service." The "details of OPTION II were "The Account Team needs to develop creative ways that Omnicare can perform services for $300K."

45.   According to Johnson & Johnson, "to avoid Best Price, the Strategic Overlay for Risperdal (2% of sales) had to be eliminated. In order to balance this, an agreement was established with Omnicare to purchase data, roughly at the cost of the Strategic Overlay for Risperdal."

46.   The "Strategic Overlay" was the bonus paid to Omnicare for the sale of Johnson & Johnson products.

47.   In October 1999, Omnicare and Johnson & Johnson signed an "Initiative Partnership Agreement" that provided separate payments from Johnson & Johnson to Omnicare for many of the services Omnicare agreed to perform under the original "Supply Agreement." The "funding for the program came from Johnson & Johnson in the form of a $300,000 check.

48.   In October of 2000, Omnicare and Johnson & Johnson signed a "Consulting & Services Agreement" with an effective date of July 1, 2000. Johnson & Johnson's payment to Omnicare for these services was intended to replace the value of the bonuses and rebates Johnson & Johnson owed Omnicare for the sale of Risperdal while avoiding Medicaid's "Best Price" threshold.

-8-

49.    Effective October 1, 2000, there was also an amendment to Johnson & Johnson and Omnicare's Supply Agreement adding Sporanox and Nizoral to the list of drugs eligible for a rebate or bonus.

50.    Johnson & Johnson made additional $300,000 "marketing fee" payments to Omnicare on at least the following dates: May 21, 2001; November 19, 2001; and August 15, 2003.

51.    The 1999 Supply Agreement required that Risperdal and Levaquin have a "Selected formulary position" at Omnicare meaning each would be a "first line therapy and would be dispensed and recommended as the antipsychotic and quinolone antibiotic of choice.

52.    Omnicare's 2000 Business Plan reported that one accomplishment in 1999 was the completion of the "Risperdal Re-Ignition Program" generating over 50% market share for Johnson & Johnson. The same business plan listed among Omnicare's 2000 "Strategies/Tactics" to "assist brand management in decisions made regarding Omnicare;" to "move Risperdal market share over 60%;" to "have Risperdal in Preferred Status for Dementia and Schizophrenia;" and to "move Levaquin market share over 70%."

53.    Since 1994, Omnicare has created "Pharmaceutical Care Guidelines." Omnicare represented that its Guide ranked pharmaceuticals for their clinical effectiveness in the geriatric community. Omnicare represented that "Preferred" status within its formulary clinical ranking meant that the particular drug had "documented distinguishing positive effects or outcomes compared with other drugs in the therapeutic class, lower potential prevalence of adverse drug reactions, or some unique characteristic that provides a clear clinical advantage in the nursing facility resident population." Rather than meeting Omnicare's criteria for preferred status for Johnson & Johnson pharmaceuticals, Johnson & Johnson contracted and paid for application of the "Preferred" label to certain of its products, including Risperdal.

54.    For nursing home accreditation purposes, one of the standards imposed was the residents should be on no more than nine medications because the more medications a resident takes, the more likely interactions between the medications become. This problem is exacerbated by the fact that most nursing home residents have multiple physicians who each prescribe different meds for different reasons. Consultant pharmacists do monthly audits to review all of the

1  medications prescribed and recommend changes to limit the likelihood of interactions. For

2  example, regulations limit drugs that can be used in geriatric patients and nursing home residents

3  taking psychotropic medications must have attempts made to reduce the dose annually.

4      55.      In the face of these requirements, in at least January 2000, Omnicare created the "one

5  extra script per patient" "Re-View Program." The Re-View program was funded by "grants" paid

6  by Johnson & Johnson totaling $251,000 in the year 2000 alone.

7      56.      Omnicare and Johnson & Johnson's Risperdal Initiative continued into 2003 not only

8  through consultant pharmacist and drug regimen review recommendations to change residents to

9  Risperdal, but also by having dispensing pharmacists contact prescribing physicians to make

10  wholesale changes from drugs created by manufacturers other than Johnson & Johnson to the drugs

11  carrying the "Preferred" status for which Johnson & Johnson paid handsomely.

12      57.      Certain of the contacts by Omnicare pharmacists were made through letters to

13  physicians asking for the authority to change prescriptions for other antipsychotic medications to

14  Risperdal. If the physician signed the authorization, any existing prescription for any resident on

15  one of the identified antipsychotic medications would automatically be changed at the pharmacy to

16  cause Risperdal to be dispensed instead.

17      58.      Omnicare reported the following to its pharmacists and operations managers:

18      **It is imperative that each and every resident on a conventional antipsychotic be**

19      **re-evaluated for appropriate conversion to an atypical antipsychotic with**

20      **Risperdal being the more cost effective GPCG 'preferred' alternative.** In

21      addition, residents excluded from the formal fax initiative should not be excluded

22      from ongoing formal consultant pharmacist evaluation for potential conversion to

23      Risperdal where clinically appropriate.

24      59.      Pursuant to Omnicare's and Johnson and Johnson's agreements, "Product Specific

25  Active Interventions" akin to the Risperdal Initiative were instituted for Levaquin, Procrit and

26  Ultram and "General Active Intervention Programs" were instituted for Duragesic and Aciphex.

27      60.      These "Initiatives" proved effective. For example, Omnicare grew Levaquin's

28  market share from 19.2% before the Initiative to 66.4% by the middle of 2001. During that same

1  time frame, Cipro, a Levaquin competitor's market share in Omnicare shrank from over 80% to

2  approximately 28%.

3  61.  Communications between Johnson & Johnson and Omnicare indicated that

4  Levaquin's market share increased 19% in five months "due to Omnicare pharmacist's physician

5  calling."

6  62.  Johnson & Johnson and Omnicare found other avenues for Johnson & Johnson to pay

7  Omnicare outside of the restrictions on "Best Price" for the drugs themselves, including annual

8  meetings and golf tournaments.

9  63.  The Agreements between Omnicare and Johnson & Johnson specifically required that

10  the deals between Omnicare and Johnson & Johnson not be made public.

11  64.  The Agreements were concealed from discovery thus tolling the statute of

12  limitations, or in the alternative, delaying the accrual of any and all available claims.

13  65.  As Johnson & Johnson was well aware, Omnicare targeted and purchased dispensing

14  pharmacies throughout the country to facilitate and expand Omnicare's market of nursing home

15  residents available.  Expanding the number of nursing home residents subjected to the various

16  marketing tools and "Initiatives" intended to increase Johnson & Johnson's market share within

17  Omnicare benefited both Johnson & Johnson and Omnicare at the expense of the nursing home

18  residents themselves.

19  66.  Omnicare and Johnson & Johnson engaged in a combination and conspiracy, pattern

20  of conduct and in business practices that affected an entire class of the elderly and infirm.

21  67.  Their combination and conspiracy began in at least 1997 and continues to date.

22  68.  The effect of the combination and conspiracy between Omnicare and Johnson &

23  Johnson is as follows:

24  a.) Omnicare's market share increased from less than 10% of the long-term care market

25  in the early 1990's to approximately 90% of the market by the end of 2009;

26  b.) Johnson & Johnson's market share of the pharmaceutical goods sold to the long-term

27  care market increased substantially;

28

-11-

c.) Omnicare's revenues continue to grow to date through the discounts and rebates it receives from manufacturers and suppliers including Johnson & Johnson;

d.) Johnson & Johnson enjoyed over $100 million in revenues annually as a direct result of the agreements with Omnicare; and

e.) To date, the more higher acuity drugs dispensed by Omnicare, the higher Omnicare's revenues.

### The Class

69.    The Class is defined as follows:  All nursing home residents and/or the estates of all nursing home residents who received drugs and/or services from Omnicare, Inc. and/or any of its direct or indirect subsidiaries, who were dispensed Risperdal, Ultram, Levaquin, Duragesic or Procrit and who paid money, who incurred a obligation for charges or whose benefits providers paid money on their behalf for those drugs from April 1, 1997 to the present.

70.    The alternative Class is defined as follows: All California nursing home residents and/or the estates of all California nursing home residents who received drugs and/or services from Omnicare, Inc. and/or any of its direct or indirect subsidiaries, who were dispensed Risperdal, Ultram, Levaquin, Duragesic or Procrit and who paid money, who incurred a obligation for charges or whose benefits providers paid money on their behalf for those drugs from April 1, 1997 to the present.

71.    The Class is so numerous that it would be impracticable to bring all members of the Class before the Court.

72.    The members of the Class are believed to number in at least the tens of thousands and are geographically dispersed among at least forty-seven states, including California.

73.    Although Plaintiff is not in possession of the identities of the members of the Class, the Class members can be identified from records within the Defendants' possession, custody or control.

74.    Because the Defendants engaged in a pattern and practice of activity, there are numerous questions of law and fact common to the Class.

75.    Plaintiffs' claims are typical of the claims available to the members of the Class.

-12-

76.     Because Defendants engaged in a pattern and practice of conduct, the questions of law and fact common to the class predominate over any Class member-specific issues.

77.     Plaintiffs are adequate Class representatives who stand ready to prosecute these claims on their own behalf as well as on behalf of all other Class members.

78.     Plaintiffs have retained counsel who is competent and has the resources and commitment to vigorously pursue this litigation on behalf of the Class.

79.     A class action is the superior method for resolution of the claims asserted because the litigation is complex and will require the commitment of significant resources while the damages to any one member of the Class are not large enough to support bringing these claims without affording the victims of the pattern and practice the opportunity to pool their resources and share the expense of the litigation.

80.     Absent use of the class action procedural mechanism Defendants' victims will be left with un-redressed injuries and Defendants will be protected from liability for the injuries they caused the elderly and infirm nursing home residents they exploited.

### Count I

### Antitrust Violations

### 15 U.S.C. §1, *et seq.*

81.     Plaintiffs re-allege and incorporate paragraphs 1 through 80 above as if restated here.

82.     Beginning in at least January 1997 to the present, Defendants Omnicare and Johnson & Johnson, together with other co-conspirators, participated in contracts, combination and conspiracy to increase the amount of money spent on pharmaceuticals for nursing home residents by increasing the number of pharmaceuticals prescribed; by causing Johnson & Johnson's share of the pharmaceutical market to be increased over other less expensive alternatives; and by charging more for the Johnson & Johnson products than was allowed by law.

83.     Defendants Omnicare and Johnson & Johnson engaged in the following:

a.) interdependent conduct;

-13-

b.) direct discussion of present and future plans concerning using Omnicare's direct and indirect relationship with nursing home residents to increase revenues to Omnicare and increase Johnson & Johnson's market share of the pharmaceuticals Omnicare dispensed to the residents;

c.) the regular exchange of information regarding the use of Omnicare's direct and indirect relationship with nursing home residents to increase revenues to Omnicare and to increase Johnson & Johnson's market share of pharmaceuticals dispensed to the residents; and

d.) an agreement or agreements to use Omnicare's direct and indirect relationship with nursing home residents to increase revenues to Omnicare and to Johnson & Johnson.

84.    The effect of the contracts, combination and conspiracy were both price advantages and non-price trade advantages that would not be available in the absence of the concerted activity and results in supra-competitive profits to Omnicare and Johnson & Johnson.

85.    Defendants' conduct increased pharmaceutical costs to nursing home residents and their families by increasing the amount of money spent on pharmaceuticals for nursing home residents by increasing the number of pharmaceuticals prescribed; by causing Johnson & Johnson's share of the pharmaceutical market to be increased over other less expensive alternatives; and by charging more for the Johnson & Johnson products than was allowed by law.

86.    In addition to greater revenues, Defendants' combination and conspiracy allowed Omnicare and Johnson & Johnson to each substantially increased their share of their respective markets.

87.    Defendants' conduct constitutes a per se violation of § 1 of the Sherman Act.

88.    Alternatively, Defendants' conduct constitutes an unreasonable restraint of trade when judged against the rule of reason.

89.    As a result of the Defendants' and co-conspirators' ongoing conduct, Plaintiffs have suffered and will continue to suffer loss or damage, and threatened loss or damage to their property or otherwise.

-14-

**Count II**

**Violation of California Business & Professions Code § 17200, *et seq***

90.    Plaintiffs re-allege and incorporate paragraphs 1 through 89 above as if restated here.

91.    Defendants' actions constituted unlawful, unfair and fraudulent business acts or practices within the meaning of California Business and Professions Code § 17200 *et seq.*

92.    As a direct and proximate result of Defendants' unlawful, unfair and fraudulent business practices, Defendants injured Plaintiffs because they paid money, incurred obligations for charges and/or their benefits providers paid money on their behalf for Risperdal, Ultram, Levaquin, Duragesic or Procrit.

93.    Accordingly, Plaintiffs may obtain all remedies and penalties authorized by the statute, including without limitation restitution, disgorgement, and other penalties for each illegal or fraudulent business act or practice, and attorneys' fees pursuant to statute and the Court's equitable powers, in an amount subject to proof.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request:

A.    That Defendants' actions alleged herein be adjudged and decreed to be in violation of the Sherman Act, 15 U.S.C. § 1 *et seq.*;

B.    That Defendants' actions alleged herein be adjudged and decreed to be in violation of the Clayton Act, 15 U.S.C. § 12 *et seq.*;

C.    That Defendants' actions alleged herein be adjudge and decreed to be in violation of California Business & Professions Code § 17200, *et seq.*;

D.    That injunctive relief is granted, including, a divestiture decree and an order enjoining Defendants from continuing the illegal course of conduct alleged herein pursuant;

E.    Defendants be found liable for the damages caused by their conduct in violation of antitrust laws;

F.    That restitution be awarded;

G.    That disgorgement be awarded;

-15-

H.   That a constructive trust be imposed;

I.   That Plaintiffs and the Class recover their costs of this suit, including reasonable attorneys' fees, as provided by law;

J.   That Plaintiffs and the Class be granted such other relief that is necessary to prevent a recurrence of the conspiracy;

K.   That Plaintiffs and the Class be awarded punitive damages in an amount to be determined by the trier of fact; and

L.   That all matters triable by a jury be so tried.

Dated: April 2, 2010

**PLAINTIFFS REQUEST A TRIAL BY JURY ON ALL COUNTS.**

Plaintiffs, BARTON SPINDLER, DEBORAH UNDERWOOD and VALERIE BURKS

By their Attorneys,

Thomas V. Girardi
Stephen G. Larson
Graham B. LippSmith
1126 Wilshire Boulevard
Los Angeles, CA 90017

-16-